IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STUART I. TEICHER,                          06-CV-1821-BR

           Plaintiff,                       OPINION AND ORDER

v.

REGENCE HEALTH AND LIFE
INSURANCE COMPANY and THE
SUSSMAN SHANK LLP LONG TERM
DISABILITY PLAN,

           Defendants.


**MEGAN E. GLOR**
Megan E. Glor, Attorneys at Law PC
621 S.W. Morrison, Suite 900
Portland, OR 97205
(503) 223-7400

**RICHARD A. KASSON**
Law Office of Richard Kasson
4905 S.W. Griffith Drive, Suite 105
Beaverton, OR 97005
(503) 670-0440

           Attorneys for Plaintiff


1 - OPINION AND ORDER

**ERIC A. LINDENAUER**
**JOY ELLIS**
Garvey Schubert Barer
121 S.W. Morrison Street, 11th Floor
Portland, OR 97204
(503) 228-3939

      Attorneys for Defendants


**BROWN, Judge.**

      This matter comes before the Court on Defendants' Motion for Summary Judgment (#45) and Plaintiff's Amended motion for Summary Judgment (#69). Plaintiff Stuart I. Teicher brings this action pursuant to 29 U.S.C. § 1132(a) of the Employee Retirement Income Security Act of 1974 (ERISA) against Defendants Regence Health and Life Insurance Company and the Sussman Shank LLP Long Term Disability Plan to recover benefits under an insurance policy for long-term disability (LTD Policy).

      On October 31, 2005, Plaintiff filed a claim for disability benefits pursuant to the LTD Policy. Regence's designated plan administrator, Disability Reinsurance Managements Services, Inc. (Disability RMS), denied Plaintiff's claim for disability benefits. Two subsequent reviews of Plaintiff's claim were also denied on June 8, 2006, and on October 26, 2006, by Cris W. Johnston, Ph.D., who reviewed Plaintiff's claim for Disability RMS.

      On December 21, 2006, Plaintiff filed an action in this Court for review of the denial of benefits. On September 21,

2 - OPINION AND ORDER

2007, Defendants moved for summary judgment on the ground that Plaintiff is not entitled to benefits for total disability under the LTD Policy.  On October 31, 2007, Plaintiff moved for summary judgment on the ground that the record establishes he is totally disabled, and, therefore, he is entitled to benefits under the LTD Policy.

On January 16, 2008, the Court heard oral argument on the parties' cross-motions for summary judgment and also granted in part and denied in part Plaintiff's Amended Motion to Admit Rebuttal Evidence (#72) as indicated on the record.

For the following reasons, the Court concludes Plaintiff is disabled within the meaning of the LTD Policy and, accordingly, **GRANTS** Plaintiff's Amended Motion for Summary Judgment (#69) and **DENIES** Defendants' Motion for Summary Judgment (#45).

## FACTUAL BACKGROUND

The administrative record before the Court reflects the following facts:

At all relevant times Plaintiff Stuart I. Teicher was a lawyer and a partner in the law firm of Sussman Shank, LLP. Plaintiff is a participant in the firm's LTD Policy.  Plaintiff suffered a mild traumatic brain injury when he fell from a ladder on September 5, 2004.  Plaintiff continued to work after September 5, 2004, but took 47 hours of sick leave during

3 - OPINION AND ORDER

September.  On September 28, 2005, Plaintiff's internist, Bradley
J. Fancher, M.D., diagnosed Plaintiff with Post-Concussive
Syndrome (PCS), but an MRI did not reveal any significant
abnormalities.  From October 2004 to May 2005, Plaintiff worked
his normal schedule (1100 billable hours over a six-month
period).  Plaintiff, however, began to experience increasing
imbalance, fatigue, headaches, and cranial pressure.  According
to Plaintiff, he tried to ignore his symptoms in the hope that
they would abate.

By late May 2005, these symptoms had worsened.  Plaintiff
experienced radiating neck pain after sleeping with his neck
sharply flexed on an airplane flight.  Plaintiff had increasing
difficulty concentrating, taking notes, and following complex
discussions with partners and clients.  On June 5, 2005,
Dr. Fancher referred Plaintiff to a neurologist, Max B. Duncan,
D.O., who concurred with the diagnosis of PCS despite another
"negative" MRI.  Dr. Duncan reported Plaintiff suffered from
"significant axonal disruption which accounts for his disruption
of higher level executive function."

Plaintiff took 24 hours of sick leave in June 2005, and at
that time his clients and co-workers began to notice his subdued
demeanor and a decline in his performance at work.  Plaintiff's
law partner, Nena Cook, noted Plaintiff's diminished cognitive
abilities were "readily apparent" and dramatically different from

his pre-injury functioning.  Ellen Teicher, Plaintiff's wife,
also noticed Plaintiff's loss of energy and mental acuity.

In July 2005 Plaintiff began to work half-time.  Because of
Plaintiff's continued complaints of difficulty in concentrating
due to nausea and headaches, Dr. Fancher performed a third MRI in
early August.  The MRI still did not reveal any significant
structural abnormalities.  Nevertheless, Plaintiff took medical
leave from mid-August to early September 2005.

After returning to work for a week in early September 2005,
Plaintiff continued to have difficulties and began transferring
his cases to other lawyers in his firm because he felt he could
not retain information or "connect the dots" and could not
adequately and ethically discharge his duties.  During that week
in early September, Plaintiff's law partner, Jeffrey S. Tarr,
noticed Plaintiff was unable to process information in a
memorandum or follow an oral update on recent events in a case
familiar to Plaintiff.

On September 18, 2005, Dr. Fancher reported Plaintiff had
continuing cognitive problems and repeated his diagnosis of
PCS with significant head trauma and cognitive impairment.
Dr. Fancher recommended Plaintiff take a medical leave of absence
and advised "it is unclear when or if you will be able to return
to your usual occupational duties."  On the basis of these
findings, Dr. Fancher referred Plaintiff to the Brain Injury

5 - OPINION AND ORDER

Rehabilitation Center (BIRC), a branch of Progressive

Rehabilitation Associates in Portland, Oregon, for further

testing.

On September 27, 2005, Plaintiff attended a day-long

transdisciplinary evaluation at BIRC conducted by, among others,

neuropsychologist Andrew P. Ellis, Ph.D., and board-certified

physiatrist Danielle L. Erb, M.D.  The evaluation revealed mild

impairments of Plaintiff's memory functioning and balance;

moderate reductions of attention, concentration, processing

speed, and executive functioning; inefficiencies of visual

skills; reduced cognitive and physical endurance; impaired

mobility and pain resulting from cervical radiculopathy; and

anxiety and mild depression.  The BIRC report indicates Plaintiff

has "[m]oderate executive function skill deficits specifically in

novel, unstructured situations with problems requiring multiple

steps and complex material.  It is felt these results reflect

greater than indicated deficits for this client, given his high

premorbid baseline level of function."  BIRC diagnosed Plaintiff

with mild traumatic brain injury and PCS.  The report indicated

Plaintiff is "[u]nable to maintain full-time employment."

Although BIRC recommended Plaintiff for its rehabilitation

program, Plaintiff declined to pay the $40,000 required to

participate.

On or about September 30, 2005, Plaintiff took medical leave

of an indeterminate duration.

On October 31, 2005, Plaintiff submitted a claim for benefits under the LTD Policy.  On the same day, Dr. Fancher referred Plaintiff to board-certified neurosurgeon Frederick T. Waller, M.D.  On November 7, 2005, Dr. Fancher submitted a "Physician's Statement" to Regence in support of Plaintiff's claim and noted his diagnosis of PCS and abnormal cognitive function were "confirmed by neuropsych testing."

On November 15, 2005, Dr. Waller examined Plaintiff and noted his continued complaints of lapses in his ability to integrate and to process information and of headaches leading to imbalance and nausea.  Dr. Waller reported he did not "feel qualified . . . to make a diagnosis of impaired cognition, pending a more formal neuropsychologic evaluation."  Accordingly, Dr. Waller referred Plaintiff to neuropsychologist Lawrence M. Binder, Ph.D.

In late November 2005, Plaintiff spent a few hours a day conferring with partners at Sussman Shank.  He continued, however, to experience difficulty in concentrating and processing auditory information during conferences and suffered fatigue after only a few hours at work.

On December 27, 2005, Plaintiff attended a follow-up appointment with Dr. Fancher, who noted Plaintiff's continued descriptions of significant cognitive impairment.  Dr. Fancher

7 - OPINION AND ORDER

directed Plaintiff to see Dr. Binder.

On January 11, 2006, Regence denied Plaintiff's claim under the LTD Policy.  On that same day, Plaintiff reported feeling exhausted and sick with head pressure after taking a long drive to Vancouver, B.C.

On January 13, 2006, Plaintiff met with Dr. Binder, but he was "too distraught" to be validly tested.  Plaintiff reported being upset over Regence's denial of his claim and considered the denial an affront to his honesty.

On January 18, 2006, Plaintiff returned to Dr. Binder for neuropsychological testing.  Dr. Binder conducted a battery of tests and reported Plaintiff performed flawlessly on the Test of Memory Malingering, on the word-recall portion of the Warrington Recognition Memory Test, and on two measures designed to test motivation.  Plaintiff also was in the 95th percentile on single-word reading and decoding, and Plaintiff's IQ scores on the WAIS-III were verbal 125, performance 121, full-scale 126, verbal comprehension 120, perceptual organization 114, working memory 126, and processing speed 128.  On most of these measures, Plaintiff scored in the 95th percentile or higher.  Plaintiff performed extremely well on timed measures of verbal fluency.

Dr. Binder, however, noted Plaintiff performed "below expectations" on other timed measures:  For example, Plaintiff scored in the 39th percentile on the PASAT and in the 25th

8 - OPINION AND ORDER

percentile on complex measures requiring problem solving.

Dr. Binder concluded Plaintiff did not have any neuropsychological abnormalities, which he defined as scoring in the 15th percentile or below.  Dr. Binder diagnosed Plaintiff with a "subtle cognitive problem" best described as PCS. Dr. Binder did not recommend Plaintiff return to work immediately as "[a]ny return to work date would be arbitrary."  Dr. Binder referred Plaintiff to McKay Moore Sohlberg, Ph.D., a specialist in speech-language pathology, to help Plaintiff with cognitive rehabilitation.

In late January and early February 2006, Plaintiff tried acupuncture to address his ongoing head pressure, dizziness, and nausea.  These treatments improved Plaintiff's balance, but they had a limited effect on his other symptoms.

On February 7, 2006, Dr. Ellis, one of the neuro-psychologists from BIRC, explained his findings to Daniel Yesu, Psy.D., who is not clearly identified in the record but who appears to be a consultant for Regence.  Dr. Ellis described Plaintiff's cognitive deficits as consistent with PCS and mild traumatic brain injury reasonably attributable to Plaintiff's fall in September 2004.  Dr. Ellis indicated Plaintiff's prognosis was guarded and that Plaintiff "would not be able to satisfy the daily challenges assumed by persons working in a busy full-time law practice" even though some people with such

difficulties might not "necessarily be precluded from a successful return to work."  Dr. Ellis concluded Plaintiff would need a "quiet work environment, with few interruptions, minimal time pressure, and the absence of novel 'on the fly' problem-solving situations."

On February 28, 2006, Plaintiff had a two-hour initial consultation with Dr. Sohlberg.  Dr. Sohlberg noted Plaintiff's cognitive complaints, including loss of concentration and mental agility, headaches, and fatigue.  Dr. Sohlberg found these symptoms "highly consistent" with PCS and indicated the delayed onset of symptoms was not an uncommon result of accidents such as the one suffered by Plaintiff.  Dr. Sohlberg also found Plaintiff's "acknowledgment and relief at improved physical functioning [relating to his cervical radiculopathy and improved balance] suggests that symptom magnification or perceived secondary gains at being injured are probably not a part of his profile."

On March 22, 2006, Plaintiff attended a follow-up appointment with Dr. Fancher.  Plaintiff continued to report symptoms such as head pressure, nausea, and problems with multi-tasking and complex cognitive tasks.  Dr. Fancher attributed these symptoms to PCS and referred Plaintiff to board-certified neurologist Hubert H. Leonard, M.D.

On April 18, 2006, neuropsychologist Cheryl S. Brischetto,

10 - OPINION AND ORDER

Ph.D., examined Plaintiff for the purpose of determining the merits of Plaintiff's claim for Social Security benefits. Dr. Brischetto noted Plaintiff presented normally and scored in the normal range in her evaluation of his mental status, but Plaintiff's difficulties with "complex information processing . . . [including] constantly learning new information, assimilating it and being able to process it, retain it and use it in a courtroom situation . . . [are] not captured on the current mental status exam." Dr. Brischetto concurred with Dr. Binder's conclusion that Plaintiff had a subtle cognitive problem. Dr. Brischetto diagnosed Plaintiff with a "cognitive disorder NOS" and PCS.

On April 24, 2006, Dr. Leonard examined Plaintiff on referral from Dr. Fancher. Based on a physical examination and his review of Plaintiff's medical history, Dr. Leonard diagnosed Plaintiff with PCS, post-traumatic headache disorder, and cognitive problems secondary to concussion. Dr. Leonard deferred to Dr. Binder's findings as to Plaintiff's specific neuro-psychological limitations. Dr. Leonard noted, "The things that impressed me most about this man was that he seemed quite honest about his specific complaints, but he was very anxious and had trouble keeping focused."

On April 24, 2006, Regence inquired as to Plaintiff's functional limitations from PCS in light of Dr. Binder's finding

11 - OPINION AND ORDER

at his examination of Plaintiff on January 18, 2006, that
Plaintiff did not have any neuropsychological "abnormalities."
On May 5, 2006, Dr. Binder responded Plaintiff suffered from the
stated limitations despite the test scores and that "there is no
one-to-one correspondence between neuropsychological test results
and performance outside the office of a neuropsychologist."
Regence asked Dr. Binder whether "there is any objective evidence
from your neuropsychological evaluation . . . that would prompt
you to either discourage him from [returning to work] or that
would lead you to expect that he would have substantial
difficulty [doing so]?"  In response, Dr. Binder merely stated,
"Not from my evaluation."

        From late April to early June, Plaintiff attended six
treatment sessions with Dr. Sohlberg designed to help Plaintiff
with cognitive rehabilitation.  Dr. Sohlberg prescribed a set of
cognitive exercises for Plaintiff that were designed to help him
improve his attention.  Plaintiff's initial scores on these
exercises were normal, but the exercises required "extraordinary"
effort and often resulted in nausea, dizziness, and headache.
Ellen Teicher, who assisted Plaintiff in his exercises at home,
noted he was limited in his performance of the exercises by
headaches and nausea.

        Although Plaintiff was having some success in engaging in
complex tasks for longer periods, he discontinued the cognitive

exercises after suffering a possible seizure during the exercises on May 18, 2006. Dr. Sohlberg suggested it might be therapeutic for Plaintiff to return to Sussman Shank for a few hours a week. Dr. Sohlberg recommended Plaintiff engage in legal work for two to three hours a day a few times a week under no time pressure, but he recommended Plaintiff not return to his normal duties. Sussman Shank, however, citing liability and ethical concerns, did not agree to allow Plaintiff to do "work as rehabilitation," but Plaintiff was allowed to return on a limited basis to do work that did not involve clients.

On May 19, 2006, Duc Nguyen, M.D., a doctor at Cedar Creek Internal Medicine where Plaintiff routinely saw Dr. Fancher, diagnosed Plaintiff with a possible seizure. On May 22, 2006, Plaintiff followed up with Dr. Fancher, who diagnosed him with a possible seizure disorder. An EEG performed on May 24, 2006, however, was normal.

On referral from Dr. Fancher, Dr. Duncan again examined Plaintiff on June 14, 2006, regarding his possible seizure. Dr. Duncan concluded Plaintiff's "spell" may have been a partial seizure or a response to a migraine headache. Dr. Duncan prescribed anti-migraine and anti-epilepsy medication to treat the symptom.

From June 15 to August 30, 2006, Plaintiff worked twice a week at Sussman Shank for two to three hours at a time.

13 - OPINION AND ORDER

Plaintiff continued to experience fatigue, headache, nausea, and memory impairments. He also continued to struggle with tracking auditory information and found the concentration required to do the work exacerbated his symptoms. On July 3 and August 1, 2006, Dr. Fancher repeated his diagnosis of PCS. Dr. Fancher concluded on July 3, 2006, that "it is clear . . . [Plaintiff] is not capable of performing complex cognitive tasks, and is unable to work as an attorney."

At the request of Plaintiff's counsel, neuropsychologist Julia A. Wong-Ngan, Ph.D., reviewed on August 18, 2006, Plaintiff's records and, in particular, Dr. Binder's evaluation. Dr. Wong-Ngan found Plaintiff's medical records support Dr. Binder's finding that Plaintiff has a "subtle cognitive problem." Dr. Wong-Ngan, however, disagreed with Dr. Binder's conclusion that Plaintiff is not substantially impaired because his test scores were well above the 16th percentile (Plaintiff's lowest scores were in the 25th and 34th percentiles). Dr. Wong-Ngan concluded the critical measure of impairment for an intelligent person such as Plaintiff is the relative change from his pre-injury abilities. Dr. Wong-Ngan notes a drop from the 99th percentile to the 50th percentile reflects a drastic change indicative of an impairment even though the 50th percentile is average. Thus, Dr. Wong-Ngan concludes Plaintiff's scores on the tests given by Dr. Binder demonstrate that Plaintiff is

cognitively impaired as a result of his brain injury.

In a letter dated August 23, 2006, Dr. Duncan found Plaintiff's symptoms represent a "classic example" of PCS resulting from a "closed head injury." Dr. Duncan explained his diagnosis that Plaintiff suffers from a cognitive impairment as follows:

> The basis of the injury is most likely axonal disruption; this implies that the axons which connect neurons to one another and other parts of the nervous system have been disrupted. Axonal disruption is not demonstrable on standard imaging studies; therefore, his negative MRI does not dissuade me from making this diagnosis.
> The axons which connect neurons to one another literally allow one part of the brain to "talk" to another part. Thus, higher cortical functions are disrupted since several areas of the brain frequently work together to process information. This is somewhat akin to an old fashioned telephone switchboard in which some of the plugs have been pulled.
> Obviously, with this type of disruption, in an individual like [Plaintiff] who performs complex civil litigations, this type of injury can be devastating.

Dr. Duncan also reported the delayed onset of Plaintiff's symptoms and their persistence over time are common with closed head injuries and in no way suggest Plaintiff is malingering.

In a letter dated September 11, 2006, Dr. Sohlberg found Plaintiff has classic physical symptoms associated with PCS and described the effects as "akin to being sea sick while trying to carry out your daily activities." Dr. Sohlberg determined

15 - OPINION AND ORDER

Plaintiff can only sustain concentration or perform cognitively demanding tasks for one to two hours.  Dr. Sohlberg concluded Plaintiff "is able to perform activities that are routine and rely on old learning; if the information processing requirements are increased and he must attend to and integrate new information, his capacity is exceeded and he becomes ill."  Dr. Sohlberg noted Plaintiff worked "extremely hard" in therapy and "saw no hints of malingering or even influence of secondary gain."  Dr. Sohlberg concurred with Dr. Duncan and noted the literature on the effects of axonal injury and his own experience treating similar injuries confirm that the onset of symptoms in cases of mild head trauma are often delayed and occur over time.

## STANDARDS

A denial of benefits challenged under ERISA is reviewed *de novo* unless the benefit plan gives the administrator discretion to construe the terms of the long-term disability policy. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Review is *de novo* unless the discretion to grant or to deny claims is unambiguously retained by the plan administrator. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999).

On October 11, 2007, the Court issued an Opinion and Order (#52) in which it concluded the appropriate standard of review in

16 - OPINION AND ORDER

this matter is *de novo*.  The Court, therefore, reviews *de novo* the plan administrator's decision that Plaintiff is not totally disabled under the LTD Policy.


## DISCUSSION

The LTD Policy defines "total disability" as follows:

> 1.   unable to perform all of the material and substantial duties of [the insured's] occupation on a full-time basis because of a disability:
>     a.   caused by injury or sickness;
>     b.   that started while insured under this policy; and
> 2.   after 24 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical or mental capacity.

Thus, the Court must determine whether Plaintiff is totally disabled under the terms of the LTD Policy.

The terms of insurance policies subject to ERISA must be interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002).  Courts must interpret policy provisions in light of the explicit language of the policy and in the context of the policy as a whole. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).  Ambiguities in the policy terms should

17 - OPINION AND ORDER

be construed against the insurer.  *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-40 (9th Cir. 1990).

## I.    The LTD Policy.

In its definition of "total disability," the LTD Policy does not define any of the terms in the phrase "all material and substantial duties of his occupation."  Thus, at oral argument, the Court requested the parties to file supplemental memoranda addressing the meaning of the term "all" and the phrase "material and substantial duties of his occupation."

### A.    "All."

Neither the parties nor the Court found a Ninth Circuit decision that ultimately defines the term "all" in the context of a long-term disability policy such as the one at issue here. Plaintiff and Defendants, however, each point to decisions in other circuits that formulate competing constructions of the term "all" generally referred to as "quantitative" and "qualitative."

In their supplemental brief, Defendants assert the quantitative construction is the appropriate one.  Defendants argue the provisions for total and partial disability must be read as an "integrated whole," and, therefore, "all" clearly means "each and every one" in light of the definition of partial disability:  the inability to perform "one or more, but *not all* of the material and substantial duties" of the insured's occupation.  (Emphasis added.)  Thus, Defendants contend

Plaintiff must prove he cannot perform each and every one of the material and substantial duties of his occupation to be entitled to total disability benefits under the LTD Policy.

To further support their position, Defendants rely on *Ellis v. Liberty Life Assurance Company of Boston*, a Fifth Circuit decision in which the court addressed the meaning of the term "all" in a policy that included provisions for partial and total disability almost identical to those in the LTD Policy. *See* 394 F.3d 262, 266 (5th Cir. 2004), *cert. denied*, 545 U.S. 1128 (2005). In *Ellis*, total disability was defined in the policy as "unable to perform all of the material and substantial duties of his occupation." *Id.* at 266. Interpreting the term "all," the court held: "We conclude that in the context of the Policy as a whole, a fair reading of the term 'unable to perform all' is that Ellis is *not* disabled for purposes of LTD if she *can* perform 'at least one' of the material and substantial duties of her occupation." *Id.* at 271. In reaching its conclusion, the court considered a definition of partial disability nearly identical to the definition in the LTD Policy as "able to perform *one or more, but not all,* of the material and substantial duties of his own or any other occupation." *Id.* at 271-72 (emphasis in original). The court held:

> Liberty reasons with irrefutable logic that if we were to credit Ellis's [qualitative] interpretation of "Disability," the definitions of "Disability" and "Partial

Disability" would conflate these separate
categories into one, *i.e.*, there would be no
difference between the eligibility
prerequisites for *total* disability and those
for *partial* disability.

                    *  *  *

       If the definition of long term
disability were interpreted to mean "unable
to perform just one," as Ellis urges, "unable
to perform all" in the definition of
*Disability* would be synonymous with "unable
to perform one or more" in the definition of
*Partial Disability*.  That simply cannot be:
Such a reading would render partial
disability's phrase "but not all" meaningless
surplusage . . . .

*Id.* at 271-72 (emphasis in original).  *See also House v. Am.*

*United Life Ins. Co.*, 499 F.3d 443, 453-54 (5th Cir. 2007).  The

Court notes, however, the Fifth Circuit's construction of the

term "all" falls under the "quantitative" approach.  Under that

approach, the insured's duties are explicitly enumerated and the

insured is entitled to total disability benefits only if he

proves he can no longer perform every one of those duties.

       On the other hand, Plaintiff argues in his supplemental

brief that (1) the term "all" in the context of the LTD Policy is

not ambiguous and means "any one, not every one" and (2) even if

the term were ambiguous, the Court should construe "all" against

Defendants as required by *Kunin* (*i.e.,* to mean any one, not every

one).  *See* 910 F.2d at 539-40.  Plaintiff also notes "all"

modifies "material and substantial duties" in the LTD Policy,

and, therefore, Plaintiff contends "the inability to perform" any

20 - OPINION AND ORDER

of those material and substantial duties "precludes the ability
to perform the occupation as a whole."

Plaintiff relies on *Hamaker v. Paul Revere Life
Insurance Company*, an unpublished opinion from the Southern
District of Indiana, in which the trial court recognized the
competing constructions of the term "all" and held the
qualitative approach was the most practical:

> In one line of cases, mostly involving
> policies with residual disability provisions,
> courts have interpreted the wording to mean
> that an insured must be unable to perform
> "all" of his important duties, or material
> and substantial duties, to qualify for a
> total disability.  These courts have held
> that the wording is not ambiguous,
> particularly if there is a residual provision
> providing benefits if the insured is able to
> perform "some but not all" of the important
> duties. Under this mathematically oriented
> reasoning, an insured's ability to perform
> just one important duty precludes a total
> disability. . . .  The problem with this line
> of reasoning is that it skirts the real
> issue, and ambiguity, present in such
> policies-defining the important duties, or in
> the language of other policies, the material
> and substantial duties.
>      The other approach-and the one adopted
> by our circuit . . . assesses a total
> disability if an insured's inability to
> perform certain duties precludes continuation
> in his or her regular occupation.  In this
> approach, the determination of a total
> disability could depend on the number of
> duties that an insured is unable to perform
> However, a total disability may also result
> from the type of duties that an insured is
> unable to perform.  This approach essentially
> looks more closely at effects and recognizes
> that some skills or duties are essential to
> continued employment in a particular

> occupation in any capacity.  Under this line
> of reasoning, regardless of the number of
> important duties an insured can still perform
> in isolation, he or she is totally disabled
> if unable to practice his or her regularly
> occupation *in toto* and residually disabled if
> merely restricted in that practice.

No. IP02-0632-C-M/S, 2004 WL 963701, at *4-*5 (S.D. Ind. Apr. 2,

2004)(internal citations omitted).

In *McFarland v. General American Life Insurance

Company*, the policy definition of total disability did not use

the term "all," but defined total disability merely as "unable to

perform the material and substantial duties of his regular

occupation."  149 F.3d 583, 586 (7th Cir. 1998).  The Seventh

Circuit assessed the threshold for total disability in light of

the undisputed fact that the plaintiff's injury left him able to

perform 35% of the duties of his occupation.  *Id.* at 585.  The

Seventh Circuit held:

> A qualitative reduction would be one
> like that proposed by General American's
> baseball analogy.  In that example, the first
> shortstop was no longer able to perform one
> core and essential aspect of his job
> (throwing) as a result of an injury.  This
> disability, while affecting only one of
> several core skills, would be enough to
> prevent him from continuing to perform as a
> shortstop.  We agree with General American
> that a person purchasing disability insurance
> with the definition of totally disabled at
> issue here would reasonably expect that, if
> he was no longer able to perform an essential
> duty of his regular occupation, resulting in
> the loss of his position, he would be
> "totally disabled."  This would be the case
> even if, in percentage terms, the disability

22 - OPINION AND ORDER

> affected an essential duty that comprised, for example, only 5% of the person's overall duties.
>
> In contrast with an injury or sickness resulting in a qualitative performance reduction, a quantitative performance reduction would be one in which the injury or sickness would not physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation. Therefore, although the person is still able to perform the actual tasks themselves, the person is reduced perhaps to 25% of the prior output. We think it possible that a reasonable interpretation of the policy language would indicate that a person whose quantitative performance was greatly reduced would also no longer be able to perform the "material and substantial" duties of his occupation.

*Id.* at 588.

In its interpretation of a disability policy without a partial disability benefit, the Eighth Circuit also held in *Seitz v. Metropolitan Life Insurance Company* that "when a Plan uses an individual's own occupation to determine whether he or she is totally disabled, being able to perform *some* job duties is insufficient to deny benefits." 433 F.3d 647, 651 (8th Cir. 2006)(emphasis in original).

As noted, the Ninth Circuit has not specifically addressed the term "all" in the context of an insured seeking total disability benefits who has cognitive impairments of the abilities integral to the essential functions of a professional such as a managing partner in a law firm. In *Saffle v. Sierra*

23 - OPINION AND ORDER

*Pacific Power Company Bargaining Unit Long Term Disability Plan*, however, the Ninth Circuit recognized the difficulties that arise from the polar extremes of both the quantitative and qualitative constructions.  85 F.3d 455, 456-57 (9th Cir. 1996).  In *Saffle*, the issue was whether the plan administrator abused his discretion in his interpretation of the definition of total disability, which was defined in the policy as "completely unable to perform each and every duty of his regular occupation."  The court held the administrator's interpretation of "each and every" was not an abuse of discretion but noted the difficult issues raised by the competing interpretations:

> Reading "each and every" literally could mean either that a claimant is not totally disabled if she can perform any single duty of her job, no matter how trivial-or that a claimant is totally disabled if she cannot perform any single duty, no matter how trivial.  There is little question that the phrase should not be given the former construction, as "total disability" would only exist if the person were essentially non-conscious.  On the other hand, Saffle's preferred construction would effectively convert benefits for total disability into benefits for partial disability. Given two possible literal meanings that are not wholly sensible, it cannot be unreasonable for the Committee to interpret the Plan so as neither to qualify, nor to disqualify, virtually everyone.
> Having said that, it is not entirely clear what the Committee meant by its substantial portion standard.  We do not accept as reasonable a substantial portion standard that connotes an inability to do a substantial number of the tasks in one's job description.  This would arbitrarily

> substitute quantity for quality.  However, we
> cannot say that the Committee lacks
> discretion to construe each and every duty of
> [the participant's] regular occupation to
> mean all of the substantial and material
> duties of her regular occupation.

*Id.* at 458-59 (internal citations omitted).  Although in *Saffle*
the Ninth Circuit did not determine the proper legal construction
of the term "all" because the court's review was limited to
whether the administrator's decision was an abuse of discretion,
the court's reasoning generally appears to resemble more closely
the qualitative approach of the Seventh and Eighth Circuits
favoring a practical reading of the term.

In any event, a careful review of the administrative
record in the case before this Court as set out below reveals
Plaintiff in these particular circumstances is totally disabled
under either the quantitative or qualitative construction of
"all" when the term is considered practically and the purpose and
context of the LTD Policy are taken into account.  Thus, this
Court need not adopt the qualitative or quantitative construction
for purposes of resolving the pending Motions.

**B.    The "Material and Substantial Duties" of Plaintiff's
        Occupation.**

As noted, the LTD Policy does not define the "material
and substantial duties" of Plaintiff's occupation.  As noted, the
Court asked the parties to identify these duties in their
supplemental briefs.  In his supplemental Memorandum, Plaintiff

25 - OPINION AND ORDER

draws on a combination of documents in the record to identify his
duties, including Regence's Job Analysis form, Sussman Shank's
Job Description, a description of Plaintiff's job by Portland
attorney Stephen F. Crew, and the United States Department of
Labor's Dictionary of Occupational Titles (DOT) description of
"Lawyer."  From these documents, Plaintiff collects a long list
of specific cognitive abilities required to fulfill his
professional duties as a lawyer and managing partner in his law
firm.  Defendants, however, contend in their Memorandum that the
Court should rely solely on the general description of a lawyer's
occupational duties found in the DOT.  Neither party provides
authority for choosing one description over the other.

　　　　With 28 years of legal experience (in a civil trial
practice and as a state and federal trial judge), this Court
knows the duties of a trial lawyer who manages a complex
commercial law practice.  The Court is also well aware of the
high professional and ethical standards required by the Oregon
State Bar and Oregon Courts as to a lawyer's representation of
clients and their interests.  *See Kearney*, 175 F.3d at 1091 ("A
district judge would likely know, as this judge's remarks
indicated he did, what trial lawyers do, without the assistance
of a secondary source such as the Occupational Outlook
Handbook.").  It is also apparent that Plaintiff's position as a
lawyer and managing partner of a large law firm demands a high

26 - OPINION AND ORDER

level of mental acuity and the ability to synthesize rapidly, to integrate, and to make use of voluminous amounts of information to advance the interests of his clients.

## II.  Analysis.

Plaintiff asserts his impairments resulting from PCS associated with concentration and cognitive function, including headache, nausea, dizziness, and fatigue, render him "unable to perform all of the material and substantial duties of his occupation on a full-time basis."  In other words, Plaintiff contends whether he is totally disabled and entitled to benefits can only be determined by assessing whether his cognitive function is impaired to such an extent that he cannot perform the duties required by his occupation.  Specifically, Plaintiff maintains his reduced cognitive endurance, impaired high-level executive functioning, and inability to rapidly process auditory information in real-time is so detrimental to his ability to practice law that he is totally disabled.

In their Motion for Summary Judgment and at oral argument, Defendants contend, however, Plaintiff is not totally disabled within the meaning of the LTD Policy because he is able to perform some of the material and substantial duties of his occupation.  Defendants also point out that Plaintiff's three MRIs indicated "no significant abnormalities," which, according to Defendants, underscores the absence of objective evidence of

significant impairment.  In addition, Defendants contend the fact
that Plaintiff did not seek any additional medical treatment
between late September 2004 and May 2005 and was able to work
long hours during that period suggests a nonphysical cause of his
"perceived cognitive difficulties."  Thus, Defendants maintain
the delayed onset of symptoms indicates a mere psychological
reaction to a mild impairment.

The record, however, is replete with evidence reflecting
Plaintiff's cognitive impairments and the functional limitations
that he suffers as a result.  Nearly two years of medical
evidence reflect Plaintiff consistently sought treatment for the
PCS symptoms that physicians and specialists agree are the result
of Plaintiff's brain injury.  Drs. Duncan, Ellis, Fancher, and
Sohlberg, in addition to the team of brain-injury specialists and
therapists at BIRC, determined Plaintiff cannot perform his
occupational duties as an attorney as a result of his brain
injury.  From September 2005-06, Dr. Fancher repeated this
conclusion on three separate occasions.

Moreover, Defendants do not point to any medical evidence in
the record that indicates Plaintiff is able to return to work as
an attorney.  At best, Defendants argue Dr. Binder implied
Plaintiff could return to work.  Although Dr. Binder indicated in
his response to Regence's questionnaire that nothing in his
evaluation suggests Plaintiff cannot return to work, he noted

28 - OPINION AND ORDER

Plaintiff continued to report cognitive limitations.  In the end, Dr. Binder concluded "there is no one-to-one correspondence between neuropsychological test results and performance outside the office of a neuropsychologist."

The record also includes Plaintiff's detailed correspondence tracking his symptoms, detailing his efforts to recover, and explaining the limiting effects of his condition.  The letters from Plaintiff's colleagues at Sussman Shank and from his wife Ellen Teicher further corroborate the existence and effects of Plaintiff's symptoms.  The Court notes the record fully supports a conclusion that Plaintiff is completely honest in his personal accounts, and there is not any basis to believe Plaintiff is exaggerating or lacking in motivation.

Defendants' contention that there is not any objective evidence of Plaintiff's impairment because Plaintiff had a normal MRI and EEG is also belied by the opinions of Drs. Duncan and Wong-Ngan.  As noted, Dr. Wong-Ngan explained Dr. Binder's neuropsychological evaluation and tests demonstrate Plaintiff is impaired despite the absence of scores below the 16th percentile because the test results reflect the dramatic decline in Plaintiff's scores post-injury.  In addition, Dr. Duncan pointed out that the axonal disruption caused by Plaintiff's closed head injury would not be reflected in MRIs or EEGs.  Furthermore, Drs. Duncan and Sohlberg both strongly disagreed with Defendants'

29 - OPINION AND ORDER

contention that Plaintiff's symptoms should have been worse
immediately following his injury if his brain injury were
significant, and both doctors pointed out the clinical and
research literature supports the fact that delayed symptoms are
normal for closed head injuries.

Defendants' LTD Policy is written in terms of Plaintiff's
occupation, and, therefore, the Court must determine whether
Plaintiff retains the skills and the capacity to perform "his
occupation" as a lawyer.  The record reflects Plaintiff's high-
level executive functions, including his abilities to process and
to learn new and complex information, are fundamentally impaired.
These abilities are integral to all of the core functions an
attorney must perform to integrate, to synthesize, and ultimately
to put to use vast amounts of detailed information in order to
represent his clients adequately and to advance his clients'
interests in negotiations or before a court.  Moreover, an
attorney is not permitted to satisfy only some of the standards
required by the profession.  The fact that Plaintiff can still
read and write is not sufficient standing alone to meet the
requirements of the profession even though those skills are
important in performing the job of an attorney.

Accordingly, whether the Court applies a quantitative
standard to find Plaintiff cannot perform each and every material
and substantial duty of his occupation because of his cognitive

30 - OPINION AND ORDER

impairment or applies a qualitative standard to find Plaintiff cannot perform a particular, critical duty that renders him unable to meet the standards of his profession, the practical outcome on this record is that Plaintiff is unable to perform "all of the material and substantial duties of his occupation."

Moreover, even if Plaintiff were able to perform one or more of the material and substantial duties of his occupation, the record establishes Plaintiff cannot perform such duties "on a full-time basis" because of his reduced cognitive endurance. As noted, Dr. Sohlberg concluded in his report dated September 11, 2006, that Plaintiff could not perform demanding cognitive tasks for more than one or two hours. Dr. Sohlberg's conclusion is supported in the record by BIRC's evaluation of Plaintiff, by Plaintiff's accounts of his symptoms, and by the statements of Mrs. Teicher. Thus, even if Plaintiff were able to perform all of the duties of his occupation, the record reflects his lack of cognitive endurance would render him unable to do so for more than one or two hours a day. Thus, the Court also concludes Plaintiff's impairments render him unable to fulfill his professional and ethical duties as a lawyer.

If Plaintiff's was not viewed as totally disabled in light of his impairments and his inability to meet the high cognitive demands required of a lawyer, the coverage of the LTD Policy would seem to be triggered only if Plaintiff "were essentially

31 - OPINION AND ORDER

non-conscious." *See Saffle*, 85 F.3d at 458.  Such a perspective would contradict the purpose of the LTD Policy and the intent of the parties, which is to provide the insured with financial protection against a loss of the ability to work resulting from injury or sickness.  The Court declines to read the policy in such a limited fashion.

In summary, the Court finds Plaintiff suffers from a cognitive impairment as a result of a closed head injury that he sustained while he was a participant in the Sussman Shank LLP Long Term Disability Plan.  As a result of Plaintiff's injury, he suffers from PCS.  The symptoms associated with PCS have impaired Plaintiff's cognitive functions to the point that he cannot continue to work as a lawyer and managing partner at Sussman Shank.  The Court, therefore, concludes Plaintiff is totally disabled within the meaning of the LTD Policy and is entitled to benefits because he is unable to perform all of the material and substantial duties of his occupation as set out herein.

## CONCLUSION

For these reasons, the Court concludes Plaintiff is totally disabled within the meaning of the LTD Policy.  Accordingly, the Court **GRANTS** Plaintiff's Amended Motion for Summary Judgment (#69) and **DENIES** Defendants' Motion for Summary Judgment (#45).

The Court directs the parties to confer concerning an

32 - OPINION AND ORDER

appropriate form of judgment and to submit to the Court not later than June 6, 2008, a stipulated form of judgment or, if the parties do not agree on a form of judgment, a joint status report summarizing their competing proposals and the reasons for any differences.

Finally, the Court requests the parties to confer as to whether this Opinion and Order should remain under seal and to inform the Court of their views by June 6, 2008.

IT IS SO ORDERED.

DATED this 20th day of May, 2008.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


33 - OPINION AND ORDER